UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CLODIA S.,

          Plaintiff,

    v.

KILOLO KIJAKAZI,
Acting Commissioner of Social
Security,

         Defendant.

No. 22 CV 5738

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

Plaintiff Clodia S.[1] appeals from the Social Security Commissioner's decision denying her supplemental security income from October 5, 2020, to October 18, 2021. For the reasons explained below, the Commissioner's decision is affirmed.

## I.    Legal Standard

Because the Social Security Appeals Council did not assume jurisdiction over the Administrative Law Judge's decision, it is a final decision of the Commissioner and ripe for review under 42 U.S.C. § 405(g). *See* 20 C.F.R. § 404.984(a). My review here is limited; I ask only whether the ALJ applied the proper legal criteria and supported his decision with substantial evidence. *See Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v.*

---

[1] I refer to plaintiff by her first name and the first initial of her last name to comply with Internal Operating Procedure 22.

*Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotations and citation omitted). An ALJ's credibility findings are given special deference and will only be overturned if "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (citation omitted).

Substantial evidence is not a high bar, but the ALJ still must build an "accurate and logical bridge" between the evidence and his conclusion. *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) (quoting *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014)). That is, the ALJ must provide "enough detail and clarity" in his reasoning "to permit meaningful appellate review." *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014) (citation omitted). I can affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g).

## II. Facts

Clodia S. has suffered from epilepsy since 1992, and has been on Tegretol, an anti-seizure medication, since then. [13-1] at 21.[2] She applied for supplemental security income benefits on October 5, 2020. [13-1] at 16. On March 19, 2021, examiners issued a disability determination explanation. [13-1] at 105. The explanation consisted of a list of past medical records, a consultative examination, a medical evaluation, and assessment of residual functional capacity, among other things. [13-1] at 94–105. The examiners wrote that "[t]here is no indication that there is a medical opinion from any medical source," and concluded that Clodia S. was not

---

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are from the CM/ECF header placed at the top of documents.

disabled. [13-1] at 100, 104. That finding and an accompanying explanation were sent to Clodia S. on March 23, 2021. [13-1] at 106, 115. According to the explanation, Clodia S. was able to do medium work with environmental limitations. [13-1] at 115.

On March 30, 2021, in response to the denial letter, Clodia S.'s doctor, Robin Snead, wrote a letter to the SSA. [13-1] at 445. In it, she said the following. Snead had treated Clodia S. for epilepsy since 2002. [13-1] at 445. Her symptoms met the criteria of social security listing 11.02. [13-1] at 445. She had suffered grand mal seizures since 2002 that occurred multiple times a month. [13-1] at 445. For the past several months (at the time the letter was written), her grand mal seizures had occurred only once a month. [13-1] at 445. Since 2002, she had suffered daily petit mal seizures. [13-1] at 445. Snead said that without her current medication, plaintiff's petit mal seizures would turn into grand mal seizures. [13-1] at 445. According to Snead, Clodia S. and her husband said the state examiner that issued the medical findings spent only three minutes with them and didn't ask them any questions to determine whether Clodia S.'s epilepsy qualified under listing 11.02. [13-1] at 446. Clodia S. also told Snead that the examiner refused to review medical records that the couple presented him. [13-1] at 446. When they offered to describe Clodia S.'s symptoms, he refused to allow them to speak. [13-1] at 446. Snead also said that Clodia S. was not capable of the medium work with environmental limitations that the examiner said she could perform. [13-1] at 446.

The SSA reconsidered the denial upon request. [13-1] at 108. In its reconsideration explanation, the examiner said again that Snead failed to return

record requests or an epilepsy report. [13-1] at 109. The examiner, however, did add a summary of Snead's letter in the "Medical Opinion" section of the report. [13-1] at 110. On June 14, 2021, the SSA again found Clodia S. not disabled, affirming its earlier decision. [13-1] at 113. Clodia S. appealed her decision to an Administrative Law Judge, who held a hearing in her case on September 30, 2021. [13-1] at 34. Four people testified at the hearing: Snead, Clodia S.'s husband, Clodia S., and a vocational expert.

Clodia S. reported the following in her application and at the hearing. Despite taking Tegretol, she continues to have both grand mal and petit mal seizures. [13-1] at 21. The seizures affect her ability to complete tasks and walk. [13-1] at 21. She can walk two blocks before needing to stop and rest for five minutes. [13-1] at 21. The petit mal seizures happen almost every morning. [13-1] at 21. They also happen during the day when she becomes tired or stressed. [13-1] at 21. Around two to three days a week, she has a petit mal seizure during the day, in addition to a morning seizure. [13-1] at 21. She doesn't do things that stress or tire her, like cleaning, because they trigger seizures. [13-1] at 21. The petit seizures last between two and three minutes. [13-1] at 21. During them, she "makes a lot of noises." [13-1] at 21. She becomes tired after a seizure and gets headaches. [13-1] at 21. She is able to resume activity after five to ten minutes, but it takes her a couple of hours before she feels "back to normal." [13-1] at 21.

Tegretol "has been working" for her and has reduced her grand mal seizures to around once a month from once a week. [13-1] at 21. At the time of the hearing, she'd

last had a grand mal seizure a month before. [13-1] at 21. During a grand mal seizure, she often falls on the floor. [13-1] at 21. After a grand mal seizure, she isn't able to "resume normal activity until the next day." [13-1] at 21. She last worked about ten years before the hearing, in a grocery/liquor store for her brother. [13-1] at 22. But she had seizures in front of customers, so her brother had to let her go after only two months. [13-1] at 22.

At the hearing, Clodia S.'s husband testified on her behalf. He reported the following. Clodia S.'s epilepsy started after she was in a car accident in 1992. [13-1] at 22. At the time, she and her husband were living in New York, and he took her to see many doctors there, including a neurologist who started her on Tegretol, after another medication hadn't worked. [13-1] at 22. After the couple moved to Illinois in 2002, she began seeing Snead, who continued to prescribe her Tegretol, but she continued "to deal with" her neurologist in New York. [13-1] at 22. Clodia S.'s husband echoed her statements about the frequency of her seizures—the petite mal seizures happen almost every morning, and sometimes more than once a day, while the grand mal seizures happen around once a month, he said. [13-1] at 22. He added that he had hired a cleaning lady to clean their home, so that Clodia S. wouldn't become stressed from cleaning and have more seizures. [13-1] at 22. But they could no longer afford the cleaning lady, so he and the couple's children had been doing the housework. [13-1] at 22.

Snead testified that she had treated Clodia S. since 2002 and last treated her in August 2021 via telemedicine appointment. [13-1] at 22. Snead also said she spoke

by telephone with Clodia S. about her seizures around three times in 2021. [13-1] at 22. In 2020, she had two to three medication-management appointments with Clodia S., at least one of which was in person. [13-1] at 22. Snead testified that Clodia S.'s grand mal seizures had "pretty much subsided." [13-1] at 22. During the petite mal seizures, Snead said, Clodia S. makes noises and sometimes has incontinence. [13-1] at 22. Snead characterized the petit mal seizures as "like a blackout" with a "loss of time." [13-1] at 22. The seizures last between three and five minutes, and Clodia S. experiences post-seizure fatigue for about five to ten minutes after. [13-1] at 22. Snead said that she had kept Clodia S. on Tegretol (even though she continued to get almost daily petit mal seizures) because the medication had stopped the grand mal seizures. [13-1] at 23. Snead said she didn't change plaintiff's medication because she is not a neurologist. She said she told plaintiff to see a neurologist but wasn't sure if plaintiff had followed up on that. [13-1] at 23. Asked about plaintiff's residual functional capacity, Snead said plaintiff could walk and/or stand for six hours out of an eight-hour day and could lift and carry five to ten pounds maximum. [13-1] at 23.

To decide whether plaintiff was disabled, the ALJ used the agency's five-step process. [13-1] at 17–18. Those steps ask: 1) whether the claimant is currently employed, 2) whether the claimant's impairment is severe, 3) whether the impairment is one that the Commissioner considers conclusively disabling, 4) if the impairment is not one that the Commissioner considers conclusively disabling, whether the claimant's residual functional capacity allows her to perform her past work, and 5) if her RFC is too limited for her to perform her past work, whether there

6

are other jobs in the national economy that she is capable of performing. 20 C.F.R. § 404.1520(a)(4).

The claimant must be unemployed and severely impaired for the ALJ to proceed to the third step. 20 C.F.R. § 404.1520(a)(4)(i)–(ii). At the third step, the ALJ looks to Appendix 1 to subpart P of Part 404, which lists the impairments the Commissioner considers per se disabling. 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant has one of the impairments in Appendix 1, she is disabled, and the ALJ does not move on to steps four and five. But if the claimant doesn't have one of the impairments listed in the appendix, the ALJ will calculate the claimant's residual functional capacity and apply it in steps four and five. 20 C.F.R. § 404.1520(a)(4)(iv)–(v). The claimant has the burden of proving disability at steps one through four; the burden of proof shifts to the Commissioner at step five. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

At step one, the ALJ found that plaintiff had not been gainfully employed since her application date. [13-1] at 18. At step two, the ALJ found that plaintiff had two severe impairments: seizure disorder and osteoarthritis of the bilateral hands. [13-1] at 18.

At step three, the ALJ found that plaintiff didn't have an impairment that met the severity of the impairments in Appendix 1. [13-1] at 18–20. The ALJ assessed the severity of plaintiff's seizure disorder and osteoarthritis, but plaintiff says she is claiming disability based only on her seizure disorder, so I disregard the ALJ's other findings. [21] at 15–16. The ALJ said plaintiff's impairments didn't meet the

requirements of listing 11.02. [13-1] at 19. That listing requires the claimant to have an impairment that equals the severity and frequency of one of the following (or equals the severity, frequency, and symptoms of one of two other provisions not relevant here), 11.02(A), (B):

- Generalized tonic-clonic seizures, occurring at least once a month for at least 3 consecutive months despite adherence to prescribed treatment; or

- Dyscognitive seizures, occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment.

Generalized tonic-clonic seizures, often referred to as grand mal seizures, are "characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing cause the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions). Tongue biting and incontinence may occur during generalized tonic-clonic seizures, and injuries may result from falling." 11.00H1a. Dyscognitive seizures, often referred to as petit mal seizures, are "characterized by alteration of consciousness without convulsions or loss of muscle control. During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) may occur. During its course, a dyscognitive seizure may progress into a generalized tonic-clonic seizure." 11.00H1b.

The ALJ found that Clodia S.'s seizures didn't meet the listing criteria for two reasons. First, he discussed the frequency of her seizures, noting that "the record fails to demonstrate a documented typical seizure pattern occurring more frequently than

8

once a month" (presumably in reference to grand mal seizures) and "also does not demonstrate nonconvulsive epilepsy…occurring more frequently than once weekly." [13-1] at 19.[3] Second, the ALJ noted that "[t]here is no objective medical documentation in the record of laboratory studies measuring the claimant's anticonvulsant blood levels to support [] the claimant's compliance with medication and recalcitrant epilepsy as required by listing 11.02." [13-1] at 19.

The ALJ based those conclusions on the State Agency medical consultants' opinions. [13-1] at 19. The medical consultants evaluated Clodia S. at the initial and reconsideration levels of the administrative process and both found that she was not disabled. [13-1] at 94–105, 108–14. The ALJ also considered the statements of Snead, who at the hearing and by letter "opined that the frequency of the claimant's seizure activity meets listing 11.02." [13-1] at 20. But the ALJ said he did not find her opinion persuasive for a number of reasons. Although she had been Clodia S.'s primary care physician for nearly two decades, Snead was not a neurologist and had no specialized education or training in neurology. [13-1] at 20. He also noted that Snead testified that she had no specialized training or familiarity with the SSA's disability rules, regulations, and listings, and wasn't familiar with the concept of "equaling" a listing. [13-1] at 20. Most importantly to the ALJ, Snead's testimony was "not supported by her own treatment notes…nor [was] it consistent with the preponderance of the

---

[3] The ALJ misstated the frequency criterion. As noted above, the regulations require at least one grand mal seizure per month or at least one petit mal seizure per week, not more than one grand mal seizure per month or more than one petit mal seizure per week. 11.02(A), (B).

longitudinal medical evidence of record." [13-1] at 20. The ALJ concluded his third-step analysis by noting, [13-1] at 20:

> The claimant's epileptic treatment is reduced to the claimant's exclusive subjective reports of seizures and Dr. Snead's routine renewals of prescription Tegretol. There is no objective medical documentation in the record of laboratory studies measuring the claimant's anticonvulsant blood levels to support that [sic] the claimant's compliance with medication and recalcitrant epilepsy as required by listing 11.02.

Before moving on to steps four and five, the ALJ assessed plaintiff's residual functional capacity. [13-1] at 20–27. A claimant's RFC is the most physical and mental activity she can perform in a work setting on a regular and continuing basis (eight hours a day, five days a week, or an equivalent work schedule), despite her limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC assessment is based on all relevant evidence in the record, including: a claimant's complete medical history; statements from medical sources about what the claimant is still capable of; and statements about the claimant's limitations from the claimant herself, her family, neighbors, friends, or other people. 20 C.F.R. § 404.1545(a)(3).

The ALJ followed the Commissioner's two-step process for evaluating symptoms, 20 C.F.R. §§ 404.1529, 416.929, first asking whether there is an underlying medical impairment that could reasonably be expected to produce the claimant's pain or symptoms, and then asking how intense and persistent those symptoms are and how much they would limit a claimant's capacity for work. [13-1] at 20–23. He began the analysis with plaintiff's reported symptoms, summarizing the testimony at the hearing and the medical records in evidence. [13-1] at 21–23. He

10

found that claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms, but that claimant's statements about the "intensity, persistence, and limiting effects" of the symptoms weren't consistent with the evidence. [13-1] at 23.

In support, he cited to some of the reasons he relied on for his step-three finding: the only medical record of treatment from the relevant timeframe did not show debilitating seizures, there were no blood-level records that would show medication compliance, the state agency medical consultants' opinions (finding plaintiff was able to do medium work with some limitations) were persuasive, and Snead was not a neurologist and had no familiarity with listing requirements. [13-1] at 24–27. The ALJ also noted that plaintiff had not been to the hospital for a seizure since her application date; plaintiff had not changed her medication regimen despite "its lack of effectiveness in terms of controlling all her seizures, which is not consistent with her allegations of total disability"; and a neurological exam showed no abnormalities, with claimant presenting as "alert oriented with normal reflexes, muscle tone and coordination without cranial nerve deficits." [13-1] at 24–25. He also pointed to the level of activity plaintiff reported she maintained: independently performing personal care, preparing simple meals, driving a car, shopping for food and clothing, managing finances, watching TV, using the computer, and attending church. [13-1] at 25. That level of activity, he said, was "grossly inconsistent with her hearing testimony and allegations of disabling functional limitations." [13-1] at 25. The ALJ also noted that disability determinations cannot be based solely on a

11

claimant's subjective complaints and testimony; with the lack of supporting medical records, the ALJ believed that plaintiff's claims rested on her subjective complaints. [13-1] at 26.

Finally, the ALJ discounted the testimony of Clodia S.'s husband. [13-1] at 27. That testimony would have buttressed claimant's subjective complaints—the husband said he'd witnessed plaintiff have seizures almost every morning and was familiar with their frequency and symptoms. [13-1] at 77–78. The ALJ said the accuracy of the husband's statements was "questionable" because the husband was "neither medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual r [sic] mannerisms." [13-1] at 27. What's more, the husband could not "be considered a disinterested third party whose testimony would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges."[4] The ALJ concluded that plaintiff has the RFC to perform medium work, but can only occasionally climb ramps and stairs, and can

---

[4] Although bias is always relevant to evaluating credibility, disregarding the testimony of family and friends because they are not "disinterested" parties poses unique problems for claimants with epilepsy. The regulations require "at least one detailed description of [a claimant's] seizures from someone, preferably a medical professional, who has observed at least one of [the claimant's] typical seizures." 11.00H2. Assuming a claimant has not had a seizure at a doctor's appointment, she must rely on the testimony of third parties who are not medical professionals. And the third parties most likely to have observed a claimant's seizure are those who spend the most time with the claimant—family, friends, and coworkers, many of whom are likely to be interested parties.

never climb ladders, ropes and scaffolds or be exposed to unprotected heights or hazardous machinery. [13-1] at 20.

At step four, the ALJ found that plaintiff had no past relevant work. [13-1] at 28. At step five, the ALJ considered plaintiff's age (51 when she applied for disability), education (two years of college), work experience, and RFC, and found that there were jobs that existed in significant numbers in the national economy that she could perform: store laborer (DOT 922.687-058), hand packager (DOT 920.587-018), and counter supply worker (DOT 319.687-010). [13-1] at 28.

The Appeals Council denied plaintiff's request for review. [13-1] at 5–8. It found that much of the evidence plaintiff submitted to the Council was not new and had been in the record before the ALJ. [13-1] at 6. It also found that new evidence— seizure description forms from plaintiff's daughter, son, and husband; a letter from Snead; and medical records from Advocate Health & Hospital—did not show a reasonable probability of changing the outcome of the decision. [13-1] at 6. Plaintiff sought judicial review in this court, [1], and the Social Security Administration moved to affirm the ALJ's decision, [24].

## III. Analysis

### A. Motion to Strike

Plaintiff moves to strike defendant's motion for summary judgment, arguing that defendant didn't comply with the local rules by filing a statement of material facts. [27]. Local Rule 56.1 requires the moving party to file a statement of facts that demonstrates its entitlement to judgment as a matter of law. N.D. Ill. Local R. 56.1(a)(2); *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). The nonmoving

party must file a response to that statement and may provide a separate statement of additional facts. N.D. Ill. Local R. 56.1(b)(2), (3); *Petty*, 754 F.3d at 420. Both statements of facts and statements of additional facts must consist of concise numbered paragraphs, supported by citations to specific pages in the evidentiary record. *See* N.D. Ill. Local R. 56.1(d)(1)–(2).

Though defendant's motion is styled as a motion for summary judgment, it is actually a motion to affirm the decision below. N.D. Ill. Local R. 16.4 (referring to SSA's motion as such, and not as motion for summary judgment); *see Kangail v. Barnhart*, 2005 WL 8162978 (N.D. Ill. July 15, 2005), n.1, *vacated and remanded in unrelated part by* 454 F.3d 627 (7th Cir. 2006) (term "motion for summary judgment" isn't accurate). I decline to strike the Commissioner's brief for failure to comply with an inapplicable rule.

Clodia S. also says the Commissioner's motion to affirm should be struck because the Commissioner filed an amended motion without seeking leave of the court. [27]. This is inaccurate. The Commissioner moved for leave to file excess pages. [22]. She attached to that motion her motion to affirm the decision. [22-1]; [22-2]. I granted the motion for leave to file excess pages, [23], and the Commissioner filed as a separate docket entry the same motion she had filed earlier as an attachment. [24], [25]. The motion to strike is denied.

## B. The ALJ's Ruling

The crux of Clodia S.'s argument is that the ALJ didn't adopt—or at least give sufficient weight to—Snead's findings, and instead impermissibly relied on other information and other medical experts.

### 1. Information Considered by the ALJ

Clodia S. spends much of her briefs arguing that, under the Federal Rules of Evidence, certain evidence should have been excluded at the hearing. [21] at 10–15; [28] at 7–8, 13–14. But the Federal Rules of Evidence do not govern Social Security hearings. *See* 42 U.S.C. § 405(b)(1) ("Evidence may be received at any hearing before the Commissioner of Social Security even though inadmissible under rules of evidence applicable to court procedure."); *Biestek*, 139 S. Ct. at 1154–55 ("Congress intended [Social Security] proceedings to be 'informal' and provided that the 'strict rules of evidence, applicable in the courtroom, are not to' apply.") (quoting *Richardson v. Perales*, 402 U.S. 389, 400 (1971)). It was proper for the ALJ to consider evidence in the record from the state examiners, despite plaintiff's argument that their opinions are inadmissible hearsay. [28] at 10–11.

### 2. The ALJ's Treatment of Snead's Testimony in Comparison to his Treatment of Other Records and Testimony

Plaintiff argues that the ALJ gave too little weight to Snead's records and testimony and too much to the ALJ's own opinion and the records of the state and consultative examiners. She says, "Since the ALJ is neither a doctor nor an expert witness and the Defendant SSA did not have an expert at the hearing, then Salem's expert witness's opinion cannot and should not be refuted by the ALJ." [21] at 11. But the ALJ is the factfinder, tasked with independently weighing conflicting evidence in the record, *see Young v. Barnhart*, 362 F.3d 995, 1001–02 (7th Cir. 2004), not with automatically deferring to the testimony or records of one person—whether that person is the treating physician or state examiner. It is true that an ALJ may not

"play doctor" by making conclusions that no expert has offered any evidence of. *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003). "The ALJ, however, is not only allowed to, but indeed must, weigh the evidence and make appropriate inferences from the record." *Seamon v. Astrue*, 364 Fed. App'x 243, 247–48 (7th Cir. 2010) (citing *Young*, 362 F.3d at 1001). The fact that the ALJ did not adopt Snead's opinion does not, by itself, mean he erred. Nor was the ALJ required to give more deference to Snead's opinions than to others'. *Compare* 20 C.F.R. § 416.927(c)(2) (regulations for claims filed before March 27, 2017) ("Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)."), *with* 20 C.F.R. § 416.920c(a) (regulations for claims filed after March 27, 2017) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)…including those from your medical sources.").

Plaintiff argues that the ALJ committed legal error by treating Snead's letter and testimony as "medical opinions," instead of medical observations. [21] at 9–10; [28] at 18.[5] I agree with plaintiff that some of Snead's testimony was not medical

---

[5] Snead made this same argument in a letter she wrote to the Appeals Council after the ALJ's decision. [16-1] at 5. "[D]octors give their opinion on what is causing an illness and opinions on how to treat the illness," she wrote. "However, doctors observe first-hand their patient's symptoms and rely on physical examinations, first-hand observations of their patients, their patient's medical history, their family's description of the symptoms and the patient's description of their own symptoms." [16-1] at 5. Snead said that was the sort of information she provided in the hearing. [16-1] at 5. She also said that plaintiff suffers monthly grand mal seizures and daily petite mal seizures. [16-1] at 5. I do not consider this letter because it was not in the record presented to the ALJ. *See* [13-1]. It was submitted to the Appeals

opinion. The regulations define medical opinion as "a statement from a medical source about what [a claimant] can still do despite [their] impairment(s) and whether [a claimant has] one or more impairment-related limitations or restrictions." 20 C.F.R. § 416.913(a)(2). Snead's testimony about the frequency and symptoms of plaintiff's seizures was not that. It was instead "other medical evidence," defined as "evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of [] impairments, [] medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." 20 C.F.R. § 416.913(a)(3). But Snead did also provide medical opinions in response to the ALJ's questions about plaintiff's capabilities. For instance, Snead testified that plaintiff could walk or stand for six hours out of an eight-hour workday and could lift or carry five to ten pounds maximum. [13-1] at 23.

The distinction between medical opinion and other medical evidence does not make a difference here. The ALJ was skeptical of Snead's letter and testimony because Snead did not have treatment records within the relevant timeframe that documented the frequency or severity of claimant's seizures. [13-1] at 24 ("[T]he only medical record of treatment since the claimant's application date of October 5, 2020,

---

Council as part of the supplemental administrative record. [16-1] at 5–6. Because the Council declined to review the decision on the basis that the new evidence would not have changed the case's outcome, I cannot consider the new evidence that was presented to them. *Stepp v. Colvin*, 795 F.3d 711, n.2, 3 (7th Cir. 2015) (noting that, in contrast to other circuits, the Seventh Circuit has held that "evidence that the Appeals Council has deemed new and material but inadequate to require reversal must be excluded from the record before the district court in its review of the ALJ's decision.").

is a single outpatient visit on October 19, 2020 for complaints of hand pain."). That would have been true no matter the label the ALJ applied to Snead's testimony.

Plaintiff also takes issue with the ALJ deferring to Snead less because Snead is not a neurologist. [28] at 8–9. But specialization is one of the factors ALJs may take into consideration in weighing conflicting evidence. 20 C.F.R. § 416.920c(c)(4). The same is true of a medical expert's familiarity or lack of familiarity with the program's evidentiary requirements. 20 C.F.R. § 416.920c(c)(5).

Plaintiff next argues that the ALJ should not have relied on the records from state examiner Dr. Karen Hoelzer. [28] at 10–13.[6] Plaintiff notes that Hoelzer spoke with her and her husband for less than five minutes in a single interview and looked at only the first page of her medical records before giving them back. [21] at 12; [28] at 11. Plaintiff says that Hoelzer "did not conduct any medical diagnosis, take any blood test, nor conduct any neurological examinations." [21] at 10. The ALJ found the state examiners' opinions persuasive, noting that they evaluated plaintiff at the initial and reconsideration levels of the review process and "reached the same conclusion[,] which is consistent with the evidence at the time their opinions were rendered and further consistent with subsequently developed evidence at [the] hearing." [13-1] at 19.

---

[6] Plaintiff says that there was only one state agency medical consultant, Dr. Karen Hoelzer. [28] at 10. Hoelzer met with plaintiff on March 19, 2021, but a second state consultant, Jennifer Western, reviewed plaintiff's medical records on June 11, 2021, after plaintiff requested reconsideration. [13-1] at 103, 114. It is unclear whether Western met with plaintiff.

The ALJ's heavy reliance on information gleaned from a less-than-five-minute visit is odd. But ALJs are required to at least consider this sort of evidence because "Federal or State agency medical [] consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 416.913a(b)(1); *see also* 20 C.F.R. § 416.920c(c)(5) (ALJs may consider "evidence showing a medical source has…an understanding of our disability program's policies and evidentiary requirements"). What's more, the ALJ did not treat their findings as dispositive. Instead, he found that their opinions were persuasive in conjunction with the fact that Snead provided no medical records documenting the severity and frequency of plaintiff's seizures in the relevant timeframe. [13-1] at 19–20.

### 3. *The ALJ's Improper Reliance on the Lack of Blood Testing to Ensure Medication Compliance*

The ALJ committed legal error when he said plaintiff was required to provide "evidence of repeated anticonvulsant blood levels within the therapeutic range, or a detailed explanation from the treating physician as to why the individual's anticonvulsant blood level remains below therapeutic despite strict compliance with prescribed therapy." [13-1] at 19. The Social Security Administration removed this requirement in 2016. *See* 79 FR 10635 (2014) (proposing revised medical criteria for evaluating neurological disorders), 81 FR 43048 (2016) (final rule, eliminating requirement for blood testing).

Plaintiff notes that this wasn't a one-off error. *See* [28] at 15. The ALJ mentioned the lack of blood levels multiple times. *See* [13-1] at 19, 20, 25, 27. Though this was legal error, it was not dispositive to the ALJ's finding that plaintiff didn't

meet the listing criteria. And "[i]f it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record…then remanding is a waste of time." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

Again, the ALJ's main reason for finding that plaintiff didn't meet the listing criteria was that there were no medical records from Snead documenting the frequency and severity of plaintiff's seizure disorder during the relevant time period. And that would have remained true even if the ALJ hadn't impermissibly taken fault with plaintiff for not providing blood-level evidence.

Clodia S. has not identified a consequential legal mistake by the ALJ, and at bottom argues that the ALJ should have weighed the evidence differently. But disagreement is not grounds for reversal, and the ALJ's explanation was supported by the evidence. *See Combs v. Kijakazi*, 69 F.4th 428, 434 (7th Cir. 2023) ("If reasonable minds could disagree on whether a claimant is disabled based on the evidence, a reviewing court must affirm the agency's decision to deny benefits.").

**IV.** **Conclusion**

Plaintiff's motion for reversing or remanding the Commissioner's decision, [21], is denied. Plaintiff's motion to strike the Commissioner's motion for summary judgment, [27], is denied. The Commissioner's motion for summary judgment, [24], is granted and the decision is affirmed. The Clerk shall enter judgment in favor of defendant and terminate this case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: July 28, 2023

21